UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ANTONIO D. TYSON                                      CIVIL ACTION

VERSUS                                               NO. 10-1174

JAMES LEBLANC ET AL.                                 SECTION "C" (2)

## REPORT AND RECOMMENDATION

Plaintiff, Antonio D. Tyson, is a convicted prisoner currently incarcerated in the B.B. "Sixty" Rayburn Correctional Center ("Rayburn") in Angie, Louisiana.  He filed this complaint pro se and in forma pauperis pursuant to 42 U.S.C. § 1983 against defendants James LeBlanc, Secretary of the Louisiana Department of Corrections ("DOC"); Rayburn Warden Robert C. Tanner and Col. Larry Grow, a Rayburn ranking correctional officer, in their official and individual capacities.

In his complaint, Tyson alleges that, while he was incarcerated in Rayburn in the "extended lockdown" area for violators of jail disciplinary rules, his First Amendment rights of access to the courts and to receive newspapers and other reading materials were violated by certain restrictions imposed upon inmates in extended lockdown.  He also alleges that the same actions violate the Louisiana Constitution.  He seeks any and all available relief, including class certification, declaratory and prospective injunctive

relief, and compensatory and punitive damages.  Record Doc. No. 1, Complaint at pp. 10-11.

On June 24, 2010, I conducted a telephone conference in this matter.  Participating were plaintiff pro se and Phyllis Glazer, counsel for defendants.  Plaintiff was sworn and testified for all purposes permitted by Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985), and its progeny.  After the Spears hearing, I concluded that further proceedings were required, and I ordered defendants to file a motion for summary judgment and plaintiff to respond. Record Doc. No. 36.

On July 21, 2010, the court granted in part plaintiff's "Motion to Amend Spears Hearing," Record Doc. No. 42, and allowed Tyson to add an Eighth Amendment conditions of confinement claim based on being housed with mentally ill inmates, which plaintiff had raised in his Notice of Objections [to Spears Report], Record Doc. No. 45, which was filed on the same day as his Motion to Amend Spears Hearing.  The court mistakenly stated in this minute entry that Tyson had also alleged in his Notice of Objections [to Spears Report] that he had not been provided with religious services, a claim that the court would allow and would address in conjunction with the planned further proceedings in this action.  Record Doc. No. 52, at p. 1.

Tyson actually stated in his Notice of Objections [to Spears Report] that he had been "denied possession of any type of personal photographic materials other than of a

2

religious nature in violation of his 1st and 14th Amendment rights." Record Doc. No. 45,

¶ 2 (emphasis added).   He has consistently made this and similar allegations in support

of his claim that defendants violated his First Amendment right to purchase, receive and

keep photographs, newspapers and other non-religious reading materials. E.g., Record

Doc. No. 40; Record Doc. No. 75, ¶ (F), at p. 5.  Thus, in fact no claim related to any

deprivation of religious materials is asserted in this case.

Plaintiff did, however, assert a new claim in his Notice of Objections [to Spears

Report] that "the use of full restraint [during] outdoor exercise prevents any type of

exercise being performed without injuries without justification violates his 8th and 14th

Amendment rights."  Record Doc. No. 45, ¶ 6.  The court did not address this new claim

in its minute entry.  To stop plaintiff's barrage of pleadings that attempted to assert new

claims and to allow defendants to prepare their summary judgment motion based on a

court record that was not constantly changing, the court also ordered that "no further

amendments to pleadings, including plaintiff's complaint, will be permitted, except upon

motion for good cause shown."  Record Doc. No. 52, at p. 2.

As ordered, defendants filed a motion for summary judgment.  Record Doc.

No. 73.  In their motion, defendants pointed out that Tyson had not moved to add any

religious exercise claim in Record Doc. Nos. 42 or 45, despite the court's statement to

the contrary in its minute entry, Record Doc. No. 52.  Defendants therefore moved for

summary judgment on plaintiff's <u>outdoor exercise</u> claim, which plaintiff had asserted in Record Doc. No. 45, although the court had not specifically allowed plaintiff to amend his complaint to assert such a claim.  Defendants in their motion did not address any religious materials claim, which they correctly noted had <u>not</u> been raised in plaintiff's prior pleadings in this lawsuit.

In plaintiff's own Motion for Summary Judgment, filed on August 18, 2010, he asserted for the first time in this lawsuit that he had been denied the ability to purchase "rel[i]gious material to practice my Christian faith."  Record Doc. No. 69, ¶ 3.  However, he never moved to amend his complaint nor showed good cause to add this claim, as the court had specifically ordered.  Record Doc. No. 52.  Therefore, I reiterate that no religious exercise claim is encompassed in this lawsuit.

Having considered defendants' motion for summary judgment, the record and the applicable law, and for the following reasons, IT IS RECOMMENDED that defendants' motion for summary judgment be GRANTED.

## <u>THE RECORD</u>

Defendants' motion argues that they are entitled to sovereign immunity to the extent they are sued in their official capacities and qualified immunity to the extent they are sued in their individual capacities on each of plaintiff's claims.  Defendants contend that Tyson cannot show any Eighth Amendment violation concerning his conditions of

confinement claims based on being housed with mentally ill inmates and remaining shackled during outdoor exercise time.  Defendants also argue that plaintiff suffered no First Amendment violation concerning his claim of denial of access to the courts based on the prison's restrictions on paper, pens, envelopes and stamps.

As to Tyson's First Amendment claim that his free speech rights were violated by the prohibition against having a television, a radio and various types of non-legal, non-religious reading materials, defendants argue that the official capacity claims should be dismissed because the challenged regulations are reasonably related to legitimate penological interests.  Defendants further contend that they are entitled to qualified immunity on plaintiff's free speech claims against them in their individual capacities because the law is not clearly established that depriving plaintiff of a television, a radio and non-legal, non-religious reading materials is a constitutional violation.

Defendants' motion is supported by the sworn affidavit of Deputy Warden Keith Bickham and certified copies of DOC and Rayburn regulations and policies.  Record Doc. No. 73-4, Defendant's Exh. 1, Affidavit of Deputy Warden Keith Bickham; Record Doc. No. 73-5, Defendant's Appendix 1, DOC Dep't Reg. No. B-09-004, Classification, Sentencing and Service Functions, Offender Fiscal Services, Indigent Offenders; Record Doc. No. 73-6, Defendant's Appendix 2, DOC Dep't Reg. No. C-03-007, Field Operations, Adult Institutions, Offender Personal Property Lists, State Issued Items,

Procedures for the Reception, Transfer and Disposal of Offender Personal Belongings;

Record Doc. No. 73-7, Defendant's Appendix 3, Rayburn Offender Posted Policy #4,

Special Management Unit; and Record Doc. No. 73-8, Defendant's Appendix 4, Rayburn

Directive #3.1.14, Use of Force and Restraints.

Plaintiff argues in his four opposition memoranda, Record Doc. Nos. 75, 76, 80

and 86, that defendants have failed to establish any legitimate penological justification

for interfering with his First Amendment rights to communicate with attorneys, family,

friends, courts, governmental agencies, news reporters and newspapers; to purchase legal

and nonlegal books, magazines and materials; and to watch television and listen to the

radio for news reports.   He also argues that defendants have shown no legitimate

penological justification for interfering with his Eighth Amendment right to exercise

without being shackled and that the cumulative effect of these deprivations violates his

Eighth Amendment rights.   Tyson contends that numerous contested facts preclude

summary judgment for defendants.[1]   He also argues that Deputy Warden Bickham "is

---

[1]The allegedly contested facts include:  not every prisoner is sentenced to extended lockdown for
disciplinary reasons, but some are placed there for protection or upon initial classification; not all
prisoners begin the lockdown program at Level One; jail officials recently removed the storage
locker from the Level One lockdown area, while Level Two still has a storage locker; the locker was
not removed based on any finding of contraband in Level One cells; volunteers visiting the prison
are permitted to distribute unlimited amounts of religious materials, which contradicts defendants'
policy against inmates keeping excessive amounts of paper; a Level One prisoner's good conduct
does not guarantee "graduation" to Level Two; unlike Level Two inmates, Level One prisoners are
not allowed to keep their legal property within their immediate control, but must store it in a cabinet

known as a civil rights violator amongst prisoners," that Deputy Warden Bickham does not have personal knowledge of the facts stated in his affidavit and that no credible evidence is in the record to support Deputy Warden Bickham's affidavit.  Plaintiff further argues that defendants waived their qualified immunity defense by failing to plead it in an answer to his complaint.

In addition, Tyson's opposition memoranda argue in support of several claims that are <u>not</u> in this case, such as alleged deprivation of due process by prison disciplinary boards, false disciplinary reports by officers, denial of physical access to a law library, denial of regular telephone usage, racially discriminatory and/or retaliatory use of pepper spray on African-American prisoners, prohibition against purchasing legal and religious materials even though Tyson can afford to buy them, inadequate space for writing in the Level One cells and the promulgation of policies by Rayburn officials, rather than the DOC, in violation of state law.  These allegations in Tyson's opposition memoranda are not addressed in this report and recommendation because the court previously ordered that no additional amendments would be allowed except upon motion for good cause

---

in the hall, where it is subject to theft; excessive paper could be eliminated by requiring disposal of newspapers and magazines that are more than seven days old; inmates in full restraints outside their cells during cell searches present no threat; and no fire has ever occurred in Extended Lockdown requiring evacuation of prisoners.  Even assuming that these alleged "facts" were supported by evidence, which they are not, none of them creates a genuine issue of disputed material fact for trial.

shown, and plaintiff did not move for leave to amend his complaint to add any of these claims.

Although plaintiff has submitted no evidence with his opposition memoranda, I have considered his sworn testimony provided during the <u>Spears</u> hearing in opposition to defendants' motion.   In his <u>Spears</u> hearing testimony provided and recorded on June 24, 2010, Record Doc. Nos. 36 and 50, Tyson began his testimony by stating that he does not wish to waive any claims that may have been included in his written submissions by providing testimony in support of his claims.   He confirmed that his claims in this case arise from his incarceration in the B.B. "Sixty" Rayburn Correctional facility in Angie, Louisiana.   Tyson stated that he is currently incarcerated based upon convictions on October 21, 1993, for rape, burglary and armed robbery for which he is serving a prison sentence of 40 years.

He stated that his claims in this case include complaints about a prison program that restricts his ability to spend his own money to make purchases in the prison canteen to eight (8) stamped envelopes, two brown envelopes, one legal pad and 50 sheets of typing paper per month, and that he is restricted to using one "flex pen" between the hours of 11 a.m. and 5 p.m.   He said that these restrictions began in February 2008 and have continued to the present time, during which he has been imprisoned at Rayburn.

Tyson confirmed that he asserts two kinds of claims that his First Amendment rights have been violated:  first, that his right of access to the courts has been infringed by prison policies limiting his purchases of supplies needed to communicate with the courts; and second, that he cannot receive certain kinds of reading materials, including newspapers, "access to the news", "order our own law books," novels, magazines, "no access to the outside, none whatsoever, they have us isolated."

As to his first claim, Tyson specified that the prison's limitations on his ability to purchase writing and mailing supplies from the canteen have affected his ability to obtain access to the courts "because when we don't have no envelopes, how can we correspond with the courts . . . they expect eight envelopes [and two brown envelopes] to last us a month when we have family and friends corresponding with us . . . when we have constantly to correspond on legal matters to the courts."

Asked if he currently has legal matters pending in court, he said he has "Tyson v. Crosby," C.A. No. 08-4445"I" pending in this court;[2] the above-captioned case pending before me; C.A. Nos. 10-1172 and 10-3576 pending in this court;[3] one pending appeal

---

[2]The correct caption in No. 08-4445"I" is Tyson v. Tanner.  No defendant named Crosby was sued in that action.

[3]Neither No. 10-1172 nor No. 10-3576 is a docket number assigned to a case brought by Tyson in this court.  However, at the time of the Spears hearing in the instant case, he did have two other cases pending in this court:  C.A. Nos. 10-335"F" and 10-1097"F".  He also had two cases on appeal to the Fifth Circuit under that court's docket numbers 10-30421 (an appeal from the judgment of this

in the federal Fifth Circuit and another that he plans to file in the federal Fifth Circuit, one dealing with his prison good time credits and another concerning restitution for "being charged for a non-positive drug test," both arising from his incarceration at Rayburn.  He stated that he also has a case pending in the Louisiana First Circuit Court of Appeal concerning his personal property that was never returned to him upon his sentencing.  He summarized that he has seven cases in several courts, all of which are currently pending, and that "none of them have been finalized."

Asked whether there has been anything he has been unable to file as a result of the restrictions on his ability to purchase supplies, Tyson stated that he has filed grievances in the prison administrative remedies procedure.  He complained that inmates in "extended lockdown" and in general population can buy more supplies, and he should be able to do the same thing, since he has his own money and should be able to spend it. He acknowledged that he has been able to send this court a steady stream of written submissions in connection with the above-captioned case, but he testified that "it's been hard. . . .  Col. Grow [a prison official named as a defendant in this case], he just told the inmate counsel that if we need extra writing paper or envelopes, to give it to us . . . ever since this suit came into effect, he authorized that. . . .  He's trying to straighten up his

---

court in C.A. No. 10-132"A") and No. 10-30532 (an appeal from a decision of this court in C.A. No. 08-4445"I").

act" in response to this lawsuit.   Plaintiff testified that Col. Grow made the pronouncement to supply extra writing material to the inmates if they need it "a couple of weeks ago."  Tyson complained, however, that this does not fix the problem because he is still limited to eight (8) stamped envelopes a month, when inmates in the general population get 20 per month.

Tyson reiterated his complaint that he is permitted use of a "flex pen" only between 11:00 a.m. and 5:00 p.m., when it is picked up.  He described the "flex pen" as an ink pen, and he complained that other areas of the prison, like the general population, the working cell block and "lockdown level 2" are permitted to keep their ink pens "all day and night."   He complained that, when he was previously held in the state penitentiary at Angola, his access to an ink pen was not limited to six (6) hours per day as it is at Rayburn.

Tyson explained that he is being held at Rayburn in "extended lockdown," a disciplinary area at the jail.  He testified that he was being held in the disciplinary area for jail "rules infractions, like fighting, aggravated disobedience, 30(c); they put me on disciplinary lockdown for disciplinary reasons when you have too many disciplinary reports."  He said his current disciplinary status means that every 90 days he must appear before the disciplinary board, and if he has had any disciplinary problems during that period, he is sent back to lockdown for another 90 days.  At the time of his <u>Spears</u>

testimony in this case, Tyson acknowledged that his next status review before the disciplinary board would be in about two-and-one-half months, so that he had last been before the board about two weeks earlier, when he was given another 90 days in disciplinary lockdown for possession of contraband, specifically cigarettes, which are prohibited in extended lockdown.  Tyson again complained that these restrictions did not exist three years ago.  He complained that prison officials are prohibiting him from spending his own money.

Asked about his second kind of First Amendment claim, that he is not being provided with newspapers and other reading materials while in "extended lockdown," Tyson testified that "it's our right to have access to the news . . . to have these privileges."  Asked what kinds of things he was prohibited from receiving, he named newspapers, magazines, "we can't even watch the news to keep up with . . . the outside world."  He complained that he is not permitted to watch television while in "extended lockdown back here" for his various disciplinary rules infractions.  Asked if the denial of television viewing privileges was part of his disciplinary punishment, Tyson launched into an unrelated speech.  He complained that the only reading materials he is permitted in "extended lockdown" is "Readers Digest 1979, 1959" and "law books from the inmate counsel that we gotta turn in and besides our mail we get, we can only have ten

correspondence, ten pages, like we get a 20-page letter we can't have but ten pages, we gotta tear the rest up."

Tyson acknowledged that, if he were not being held in extended lockdown for various violations of disciplinary rules, he would be able to receive newspapers, other reading materials and access to television viewing. "It's still discrimination. You can't do one part of the prison right and do another part of the prison wrong." He complained that other correctional institutions do not have similar restrictions on their disciplinary-problem prisoners being held in extended lockdown and that at one time there were no such restrictions at Rayburn. He alleged that Rayburn prison officials are attempting through their regulations to limit inmates who are held in extended disciplinary lockdown from having access to the courts.

On cross-examination, Tyson stated that he desires whatever remedies are available, including but not limited to a change in the prison regulations and damages, if the court makes that determination.

Following the hearing, I ordered defendants to file an appropriate motion for summary judgment, supported by evidence, no later than July 30, 2010. Plaintiff was required to respond in writing no later than August 13, 2010. Record Doc. No. 36. To accommodate subsequent discovery requests, I extended the summary judgment deadlines to August 27 and September 10, 2010, respectively. Record Doc. No. 52.

13

Defendants timely filed their motion.  Record Doc. No. 73.  Plaintiff filed a written Opposition to Defendants Summary Judgment, Record Doc. No. 75; an Amended Opposition Memorandum, Record Doc. No. 76; an Amended Opposition III, Record Doc. No. 80; and an Opposition to Summary Judgment II, Record Doc. No. 86.

Tyson filed several motions and objections seeking relief, all of which were deferred pending the court's consideration of defendants' motion for summary judgment. These pleadings are (1) Motion for Judgment on the Pleadings, Record Doc. No. 56; (2) Motion for Judgment on the Pleadings, Record Doc. No. 57; (3) Request for Declaratory and Prospective Injunctive Relief, Record Doc. No. 66; (4) Motion for Summary Judgment, Record Doc. No. 69; (5) Notice of Objections, Record Doc. No. 81; (6) Document in Support of Summary Judgment, Record Doc. No. 82; (7) Amended Motion for Summary Judgment, Record Doc. No. 83; (8) Notice of Voluntary Compliance in Part, Record Doc. No. 84, and (9) Request Preservation of All Objection, Record Doc. No. 85.

## ANALYSIS

### I.   STANDARDS OF REVIEW

The purpose of a <u>Spears</u> hearing is to dig beneath the conclusional allegations of a pro se complaint, to ascertain exactly what the prisoner alleges occurred and the legal basis of the claims.  <u>Spears</u>, 766 F.2d at 180.  "[T]he <u>Spears</u> procedure affords the

plaintiff an opportunity to verbalize his complaints, in a manner of communication more comfortable to many prisoners."  Davis, 157 F.3d at 1005.  The information elicited at such an evidentiary hearing is in the nature of an amended complaint or a more definite statement under Fed. R. Civ. P. 12(e).  Wilson v. Barrientos, 926 F.2d 480, 481 (5th Cir. 1991); Adams v. Hansen, 906 F.2d 192, 194 (5th Cir. 1990).  "Upon development of the actual nature of the complaint, it may also appear that no justiciable basis for a federal claim exists."  Spears, 766 F.2d at 182.

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue of material fact, but it is not required to negate elements of the nonmoving party's case.  Capitol Indem. Corp. v. United States, 452 F.3d 428, 430 (5th Cir. 2006) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

A fact is "material" if its resolution in favor of one party might affect the outcome of the action under governing law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  No genuine issue of material fact exists if a rational trier of fact could not find

15

for the nonmoving party based on the evidence presented.  <u>National Ass'n of Gov't Employees v. City Pub. Serv. Bd.</u>, 40 F.3d 698, 712 (5th Cir. 1994).

To withstand a properly supported motion, the nonmoving party who bears the burden of proof at trial must come forward with evidence to support the essential elements of its claim.  <u>Id.</u> (citing <u>Celotex</u>, 477 U.S. at 321-23).  "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial."  <u>Celotex</u>, 477 U.S. at 323; <u>accord</u> <u>Capitol Indem. Corp.</u>, 452 F.3d at 430.

"Factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that an actual controversy exists."  <u>Edwards v. Your Credit, Inc.</u>, 148 F.3d 427, 432 (5th Cir. 1998); <u>accord</u> <u>Murray v. Earle</u>, 405 F.3d 278, 284 (5th Cir. 2005).  "<u>We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts.</u>"  <u>Badon v. R J R Nabisco Inc.</u>, 224 F.3d 382, 394 (5th Cir. 2000) (quotation omitted) (emphasis in original).  "Conclusory allegations unsupported by specific facts . . . will not prevent the award of summary judgment; 'the plaintiff [can]not rest on his allegations . . . to get to a jury without any "significant probative evidence tending to support the complaint."'"  <u>National Ass'n of Gov't Employees</u>, 40 F.3d at 713 (quoting <u>Anderson</u>, 477 U.S. at 249).

"Moreover, the nonmoving party's burden is not affected by the type of case; summary judgment is appropriate in <u>any</u> case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994) (quotation omitted) (emphasis in original); <u>accord</u> <u>Duron v. Albertson's LLC</u>, 560 F.3d 288, 291 (5th Cir. 2009).

II.    <u>FIRST AMENDMENT CLAIMS</u>

    A.    <u>Access to Courts</u>

Plaintiff's complaint, as expanded upon by his testimony, asserts two separate First Amendment claims.  His first claim that he was denied access to the courts by defendants' restrictions on his purchases and use of writing and mailing materials must be analyzed under the standard established in <u>Lewis v. Casey</u>, 518 U.S. 343, 356 (1996). Specifically, Tyson alleges that he is limited to eight (8) stamped envelopes, two brown envelopes, one legal pad and 50 sheets of typing paper per month, that he is restricted to using one "flex pen" between the hours of 11 a.m. and 5 p.m., that he is not allowed to keep more than 10 pages of correspondence in his cell and that there is no storage locker space in the cells in Extended Lockdown Level 1.  Defendants' competent summary judgment evidence establishes that these restrictions are placed on all prisoners, like Tyson, who are housed in Extended Lockdown Level 1.

Prisoners have a First Amendment right of meaningful access to the courts through adequate law libraries or assistance from legally trained personnel.  Bounds v. Smith, 430 U.S. 817, 828 (1977); Dickinson v. TX, Fort Bend County, 325 F. App'x 389, 390 (5th Cir. 2009); Sandoval v. Johns, 264 F.3d 1142, 2001 WL 822779, at *1 (5th Cir. 2001); McDonald v. Steward, 132 F.3d 225, 230 (5th Cir. 1998); Degrate v. Godwin, 84 F.3d 768, 768-69 (5th Cir. 1996).  However, "[w]hile the precise contours of a prisoner's right of access to the courts remain somewhat obscure, the Supreme Court has not extended this right to encompass more than the ability of an inmate to prepare and transmit a necessary legal document to a court."  Vaccaro v. U.S., 125 F.3d 852, 1997 WL 574977, at *1 (5th Cir. 1997) (quotation omitted) (emphasis added); accord Terry v. Hubert, 609 F.3d 757, 762 (5th Cir. 2010); Norton v. Dimazana, 122 F.3d 286, 290 (5th Cir. 1997); Eason v. Thaler, 73 F.3d 1322, 1328 (5th Cir. 1996).  "The right of access to the courts, however, 'guarantees no particular methodology but rather the conferral of a capability–the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'"  Terry, 609 F.3d at 761 (quoting Lewis, 518 U.S. at 354).

Significantly, to state a claim that his constitutional right of access to the courts was violated, Tyson must demonstrate that his position as a litigant was actually prejudiced.  Lewis, 518 U.S. at 356; Terry, 609 F.3d at 762; Brewster v. Dretke, 587 F.3d

18

764, 769 (5th Cir. 2009); Cochran v. Baldwin, 196 F. App'x 256, 257-58 (5th Cir. 2006). The inmate must "demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." Lewis, 518 U.S. at 351.

Tyson wholly fails to establish the essential elements of a First Amendment claim detailed above, either in his complaint or his testimony. It is clear that he has submitted a constant barrage of written materials sufficient to prosecute his civil cases in this court. There are 85 docket entries in the instant case, which has proceeded through a Spears hearing and is now being considered on its merits. Tyson has submitted numerous pleadings in this case, including two motions for judgment on the pleadings, a motion and an amended motion for summary judgment and three memoranda in opposition to defendants' summary judgment motion, plus numerous, repetitive pleadings, response memoranda, objections and other documents concerning other issues. He submitted so many pleadings that the court was compelled to order that no more amendments would be allowed, just to allow the defendants time to prepare their summary judgment motion based on a record that was not constantly changing.

Plaintiff has also been able to prosecute his other civil actions in this court, including C.A. No. 08-4445"I", an inmate civil rights action with more than 200 entries on the docket sheet, which is still pending; C.A. No. 10-335"F", a habeas corpus case in which judgment was entered against Tyson on September 8, 2010 and which he is

currently appealing to the Fifth Circuit under No. 10-30949; and C.A. No. 10-1097"F",

a habeas corpus case that was dismissed for failure to exhaust state court remedies on

September 24, 2010 and which is on appeal under the Fifth Circuit's No. 10-31076.  At

the time of the <u>Spears</u> hearing in the instant case, Tyson also had two cases pending on

appeal to the Fifth Circuit:   Under that court's docket No. 10-30421, an appeal from the

decision of this court in C.A. No. 10-132"A", in which the Fifth Circuit affirmed this

court's judgment on October 29, 2010; and No. 10-30532, an appeal from a decision of

this court in C.A. No. 08-4445"I", which the Fifth Circuit dismissed on November 4,

2010, for lack of jurisdiction because there was no final judgment from which to appeal.

Therefore, it must be concluded that Tyson's First Amendment right, which

encompasses nothing more than the ability to prepare and transmit a necessary legal

document to a court, <u>Terry</u>, 609 F.3d at 762; <u>Vaccaro</u>, 1997 WL 574977, at *1; <u>Norton</u>,

122 F.3d at 290; <u>Eason</u>, 73 F.3d at 1328, was not violated.

In addition, it is clear that no actual legal prejudice to Tyson's position as a litigant

of the type required by <u>Lewis</u> was caused by any action or omission of the defendants.

"[C]ausation is an element of a section 1983 claim; [defendants'] actions must have

actually caused the deprivation . . . of which [plaintiff] complains." <u>Hart v. O'Brien</u>, 127

F.3d 424, 446 (5th Cir. 1997), <u>abrogated in part on other grounds, as recognized in</u>

<u>Spivey v. Robertson</u>, 197 F.3d 772 (5th Cir. 1999); <u>accord</u> <u>Brown v. Bryan County</u>, 219

F.3d 450, 457 (5th Cir. 2000). In <u>Lewis</u>, the Supreme Court made clear that an inmate <u>must establish actual injury</u> to state a claim for denial of his right of access to the courts. In examining the particular claims of the inmates in the <u>Lewis</u> case, the Court stated that the First Amendment right of prisoners to access to the courts is the right to "have a reasonably adequate opportunity to file <u>non</u>frivolous legal claims challenging their convictions or conditions of confinement." <u>Lewis</u>, 518 U.S. at 356 (emphasis added).

As noted above, a prisoner's First Amendment right of access to the courts encompasses nothing more than the ability to prepare and transmit a necessary legal document to a court. Tyson clearly has enjoyed that ability, despite the restrictions on paper, pens, envelopes and stamps to which he is subject while in Extended Lockdown Level 1. He has not provided any evidence that his ability to prepare and transmit a necessary, nonfrivolous legal document has been hindered in any particular legal proceeding. <u>See</u> <u>Pickett v. Nunn</u>, 367 F. App'x 536, 538 (5th Cir. 2010) (prisoner who alleged that jail officials had confiscated certain records, so that he was unable to provide the records as exhibits in his lawsuits, failed to establish actual prejudice because he did not allege that he was prevented from making factual allegations in each lawsuit as a result of the lack of records); <u>Terry</u>, 609 F.3d at 762 (prisoner "had the ability to file a legally sufficient claim challenging his confinement" when he "had access to writing and mailing materials"); <u>Brewster</u>, 587 F.3d at 769 (inmate who alleged that defendants'

confiscation of his copy of a law journal and "wite-out" hindered his ability to draft pleadings failed to demonstrate actual injury); <u>Houser v. Breaux</u>, No. 1:07-CV-348, 2010 WL 2573998, at *5 (E.D. Tex. Mar. 1, 2010) (Hines, M.J.), <u>report & recommendation adopted</u>, 2010 WL 2573989 (E.D. Tex. June 21, 2010) (Crone, J.) (prisoner who claimed that defendants confiscated his legal documents and denied him a storage locker for his excess legal materials failed to demonstrate actual injury to his ability to file nonfrivolous pleadings).

    For all of the foregoing reasons, Tyson's claim concerning inadequate access to writing and mailing materials at the jail is legally frivolous and fails to state a claim upon which relief can be granted under Section 1983.

      B.    <u>Access to Reading Materials</u>

    Plaintiff's second claim that his First Amendment rights to watch television, listen to the radio and receive newspapers and other non-legal, non-religious reading materials must be analyzed under the separate standard established in <u>Turner v. Safley</u>, 482 U.S. 78 (1987). Defendants argue that plaintiff's claims against them in both their official and their individual capacities should be dismissed.

1.    <u>Official capacity claim.</u>

In <u>Beard v. Banks</u>, 548 U.S. 521 (2006), the United States Supreme Court considered an inmate's First Amendment challenge to a prison regulation that severely limited his access to newspapers, magazines and photographs while he was in the most restrictive level of disciplinary lockdown.  The Court reiterated its holdings and the standards previously expressed in <u>Turner</u> and <u>Overton v. Bazzetta</u>, 539 U.S. 126 (2003), by again recognizing

> that imprisonment does not automatically deprive a prisoner of certain important constitutional protections, including those of the First Amendment . . .  But at the same time the Constitution sometimes permits greater restriction of such rights in a prison than it would allow elsewhere. . . .  As <u>Overton</u> (summarizing pre-<u>Turner</u> case law) pointed out, courts owe substantial deference to the professional judgment of prison administrators.  And <u>Turner</u> reconciled these principles by holding that restrictive prison regulations are permissible if they are reasonably related to legitimate penological interests, and are not an exaggerated response to such objectives . . . .

<u>Beard</u>, 548 U.S. at 528 (quotation and citations omitted).  The Court in <u>Beard</u> applied the same standard it had previously established in <u>Turner</u> by stating that four factors must be evaluated to determine the constitutionality of a prison practice or regulation that deprives or restricts a prisoner's First Amendment right of access to newspapers and other non-religious, non-legal materials.

> First, is there a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it?  Second, are

there alternative means of exercising the right that remain open to prison inmates?   Third, what impact will accommodation of the asserted constitutional right . . . have on guards and other inmates, and on the allocation of prison resources generally?   And, fourth, are ready alternatives for furthering the governmental interest available?

Id. at 529 (quotations and citations omitted).  In a recent decision addressing the First Amendment rights of prisoners, the Fifth Circuit noted that, in Beard,

the Supreme Court, unsurprisingly, acknowledged the particular importance of the first factor, explaining that in some cases the second, third, and fourth factors can "add little, one way or another, to the first factor's basic logical rationale."  In the light of the first factor, "the real task" is to determine whether there is a "reasonable relation"–that is, "more than simply a logical relation"–between the prison regulation and the legitimate penological interest.'"

Morgan v. Quarterman, 570 F.3d 663, 666 (5th Cir. 2009) (quoting Beard, 548 U.S. at 532, 533).

Thus, prison restrictions on an inmate's access to television, radio, newspapers and other non-legal, non-religious materials do not violate his First Amendment rights if the restrictions are reasonably related to legitimate penological interests.  Beard, 548 U.S. at 530; Thornburgh v. Abbott, 490 U.S. 401, 413 (1989); Turner, 482 U.S. at 89; Morgan, 570 F.3d at 666.

In the instant case, defendants' competent summary judgment evidence, consisting of the sworn affidavit of Deputy Warden Bickham and certified copies of prison regulations, and plaintiff's testimony and written submissions establish that Rayburn

houses its most dangerous and badly behaved inmates in Extended Lockdown.  Inmates are sentenced to Extended Lockdown based on continued misconduct, very serious violations of the disciplinary rules or assaults on staff and/or other inmates.

Tyson is housed in Extended Lockdown Level 1, the most restrictive level of extended lockdown, based on his extensive disciplinary record, which includes fighting, aggravated disobedience and possession of contraband.  Inmates housed in Extended Lockdown Level 1 are restricted in the type and amount of reading, writing and mailing materials they can receive and possess.  Prisoners may "graduate" from Extended Lockdown Level 1 to the less restrictive Level 2.

Inmate Posted Policy No. 4 restricts the type and amount of personal items, including reading material and correspondence, that prisoners in Extended Lockdown Level 1 may keep in their cells.  Personal items are restricted for numerous reasons, including:  there are no lockers, storage areas or shelves in Level 1 cells because such structures could be torn loose and used as a weapon or shield; there are fewer places for a prisoner to hide contraband; it is easier and quicker to search a cell that contains only a few items of personal property, which both increases the possibility of finding contraband and limits the length of direct contact between inmates and jail officials; staffing limitations prevent jail officials from spending an extended amount of time searching cells and inmates; during a search, the inmate must be removed from the cell,

25

which presents a greater threat to security when the prisoner is housed in maximum security custody; restricting personal property prevents inmates from misusing it, such as the possibility that excessive amounts of books and papers can be set on fire or used to stop up a toilet and flood a cell, with either situation causing a security threat and increasing the possibility of injury to staff and other inmates if it becomes necessary to enter the prisoner's cell or to evacuate the area; and the cost of clean up and possible repairs in the event of a fire or a plumbing breakdown.

Inmates in Extended Lockdown Level 1 are prohibited from possessing photographs, television, newspapers, magazines and radios.  Prisoners in Extended Lockdown Level 2 may have photographs and limited access to television.  Inmates in the working cell block may also have a "walk-man" type of radio or CD player.  Thus, possession of photographs, newspapers, magazines and radios and access to television are privileges, which must be earned and are awarded to prisoners who do not have major disciplinary problems.  Withdrawal of privileges is intended to encourage better behavior on the part of inmates, like Tyson, who have extensive disciplinary conduct records. Inmates in Extended Lockdown Level 1 have few other privileges to lose.

The evidence establishes that the challenged regulations are reasonably related to legitimate penological interests.  Valid, rational connections exist between the prison regulations that restrict the access of inmates in Extended Lockdown Level 1, including

Tyson, to reading materials, radio and television and the legitimate governmental interests that defendants have put forward to justify the regulations. Defendants have asserted reasons of safety, security, punishment for bad behavior and the reward of privileges for improved behavior.

Tyson has produced no evidence sufficient to raise a disputed fact issue that the policies are not reasonably related to legitimate penological interests. He contends that prison officials could use other, less restrictive methods to accomplish some of the same goals. However, the court

> must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison authorities. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

Beard, 548 U.S. at 530. The possible existence of an alternative method to achieve a stated penological goal does not undermine the deference accorded to prison officials in exercising their professional judgment to choose a method that is reasonably related to the goal. They are not required to choose the least restrictive alternative. Samford v. Dretke, 562 F.3d 674, 681 (5th Cir. 2009) (citing Overton, 539 U.S. at 136; Victoria W. v. Larpenter, 369 F.3d 475, 484 (5th Cir. 2004)).

The Supreme Court in Beard noted that the Secretary of the Department of Corrections in that case had set forth several justifications for the prison's policy that

"'denies newspapers, magazines, and photographs' to a group of specially dangerous and

recalcitrant inmates,"

> including the need to motivate better behavior on the part of particularly
> difficult prisoners, the need to minimize the amount of property they
> control in their cells, and the need to ensure prison safety, by, for example,
> diminishing the amount of material a prisoner might use to start a cell fire.
> We need go no further than the first justification, that of providing
> increased incentives for better prison behavior. Applying the well-
> established substantive and procedural standards set forth in [Turner and
> Overton], we find, on the basis of the record before us, that the Secretary's
> justification is adequate.

Id. at 524, 530.

The affidavit of Deputy Warden Bickham in the instant case, just like the evidence

in Beard, provides sufficient evidence that the challenged regulations are reasonably

related to the legitimate penological purposes cited by defendants. Id. at 531-32. Even

if the other three Turner factors appear to weigh in plaintiff's favor, as they did in Beard,

because "no 'alternative means of exercising the right' remain open to him" as long as

he remains on Extended Lockdown Level 1, id. at 532, those "factors can 'add little, one

way or another, to the first factor's basic logical rationale.'" Morgan, 570 F.3d at 666

(quoting Beard, 548 U.S. at 532).

Just as the Supreme Court's finding in Beard, that the challenged regulation

denying newspapers and other leisure materials to the worst-behaved inmates, like

Tyson, was reasonably related to the legitimate penological purpose of providing

28

increased incentives for better behavior, warranted summary judgment in the defendant's favor, the same finding warrants summary judgment for defendants in their official capacities in the instant case.

2.    Individual capacity claim.

Defendants argue that they are entitled to qualified immunity on Tyson's claim that they violated his First Amendment rights in their individual capacities by denying him access to newspapers, radio and television.  Defendants contend that their conduct in this regard did "'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Pearson v. Callahan, 129 S. Ct. 808, 815 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

The Fifth Circuit recently summarized the procedure for addressing a qualified immunity defense as follows.

> The doctrine of qualified immunity offers a shield against civil liability for government employees "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." . . . .  "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken."
> In Saucier v. Katz, 533 U.S. 194 . . . (2001), the Supreme Court articulated a mandatory "two-step sequence for resolving government officials' qualified immunity claims."  Saucier required that lower courts consider first, whether "the challenged conduct, viewed in the light most favorable to the plaintiff, would actually amount to a violation of

[constitutional or] federal law," and second, if a violation has been alleged, "whether the right was clearly established" at the time of the alleged government misconduct. In the recent case of Pearson v. Callahan, the Court reconsidered the Saucier procedure, determined that "while the [two-step] sequence . . . is often appropriate, it should no longer be regarded as mandatory," and gave lower courts "permi[ssion] to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." In conducting our initial inquiry–whether the [plaintiffs] have alleged a violation of a constitutional right–we "employ currently applicable constitutional standards."

On the second inquiry–whether the right allegedly violated is "clearly established"–"[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." "The 'clearly established' standard does not mean that officials' conduct is protected by qualified immunity unless the very action in question has previously been held unlawful." "[W]hat clearly established means . . . depends largely upon the level of generality at which the relevant legal rule is to be identified." "[A]n official does not lose qualified immunity merely because a certain right is clearly established in the abstract." Officials should receive the protection of qualified immunity "unless the law is clear in the more particularized sense that reasonable officials should be on notice that their conduct is unlawful." The court's focus, for purposes of the "clearly established" analysis, should be on "fair warning": qualified immunity is unavailable "despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights."

Wernecke v. Garcia, 591 F.3d 386, 392-93 (5th Cir. 2009) (quoting Harlow, 457 U.S. at 818; Pearson, 129 S. Ct. at 815; Hope v. Pelzer, 536 U.S. 730, 740 (2002); Saucier, 533 U.S. at 201; Wilson v. Layne, 526 U.S. 603, 614 (1999); Anderson v. Creighton, 483 U.S. 635, 639, 640 (1987)) (internal quotations omitted) (additional citations omitted).

Defendants argue that the Supreme Court's decision in Beard, 548 U.S. at 528-32 (discussed in the preceding section of this report and recommendation), precludes a finding that the law was clearly established that depriving Tyson of newspapers, magazines, radio and television as a part of the prison's disciplinary process violated the First Amendment.  Whether a constitutional right is clearly established is a purely legal question.  Nance v. New Orleans & Baton Rouge S.S. Pilots' Ass'n, 174 F. App'x 849, 852 (5th Cir. 2006) (citing Siegert v. Gilley, 500 U.S. 226, 232 (1991)); Frazier v. Hataway, 58 F. App'x 595, 2003 WL 261768, at *1 (5th Cir. 2003); Kinney v. Weaver, 301 F.3d 253, 261 (5th Cir. 2002).  The Supreme Court held in Beard in 2006 that the specific conduct of which Tyson complains, based on the same legitimate penological purposes that defendants have asserted here and in similar factual circumstances, did not violate the First Amendment.  That opinion has not been overruled or called into question by either the Supreme Court or the Fifth Circuit.  Thus, the constitutional right that Tyson claims was not clearly established and defendants would not have understood that what they were doing violated that right.

Accordingly, defendants are entitled to qualified immunity and to summary judgment in their favor on this claim.

III.  <u>EIGHTH AMENDMENT CLAIMS</u>

Tyson brings two claims under the Eighth Amendment, which prohibits the cruel and unusual punishment of convicted prisoners.  <u>Haralson v. Campuzano</u>, 356 F. App'x 692, 696 (5th Cir. 2009) (citing <u>Wilson v. Seiter</u>, 501 U.S. 294, 296-97 (1991)).  First, plaintiff contends that being required to remain shackled during outdoor exercise creates a risk of injury that prevents him from exercising at all.  Record Doc. No. 45, at ¶ 6.[4] Second, he complains of being housed with mentally ill inmates (an allegation that defendants do not dispute, solely for purposes of their pending summary judgment motion).  Tyson alleges broadly that he was subjected to excessive noise created by the mentally ill inmates and that he sometimes smelled and/or inhaled chemical fumes when a nearby mentally ill inmate was sprayed with a chemical agent as a disciplinary measure.

Tyson was a convicted prisoner during the time period about which he complains. Regardless whether an inmate is a pretrial detainee or a convicted prisoner, however, the standard of liability is the same for episodic acts or omissions of jail officials of the type

---

[4]As previously noted, Tyson alleged an Eighth Amendment claim based on lack of outdoor exercise in his Notice of Objections, Record Doc. No. 45, not a First Amendment claim based on the exercise of his religion, as the court mistakenly stated when it allowed him to amend his complaint to bring the new claims that he asserted in his Notice of Objections.  Record Doc. No. 52. Defendants therefore moved for summary judgment on Tyson's Eighth Amendment exercise claim.

alleged in this case.  McCarty v. Zapata County, 243 F. App'x 792, 794 (5th Cir. 2007);

Olabisiomotosho v. City of Houston, 185 F.3d 521, 526 (5th Cir. 1999).  The Fifth

Circuit held in Hare v. City of Corinth, 74 F.3d 633 (5th Cir. 1996),

> (1) that the State owes the same duty under the Due Process Clause and the
> Eighth Amendment to provide both pretrial detainees and convicted
> inmates with basic human needs, including medical care and protection
> from harm, during their confinement; and (2) that a state jail official's
> liability for episodic acts or omissions cannot attach unless the official had
> subjective knowledge of a substantial risk of serious harm to a pretrial
> detainee but responded with deliberate indifference to that risk.

Id. at 650.

Here, nothing in the evidentiary record establishes that the conditions plaintiff

described were the result of a prison official's act either "implement[ing] a rule or

restriction or otherwise demonstrat[ing] the existence of an identifiable intended

condition or practice" or that the "official's acts or omissions were sufficiently extended

or pervasive, or otherwise typical of extended or pervasive misconduct by other officials,

to prove an intended condition or practice."  Id. at 645. Thus, the complained-of harm is

a particular act or omission of one or more officials, and the deliberate indifference

standard enunciated in Estelle v. Gamble, 429 U.S. 97, 104 (1976), applies.  Tamez v.

Manthey, 589 F.3d 764, 769-70 (5th Cir. 2009); Olabisiomotosho, 185 F.3d at 526.

The Supreme Court held in Estelle that only deliberate indifference, "an

unnecessary and wanton infliction of pain . . . or acts repugnant to the conscience of

mankind," constitutes conduct proscribed by the Eighth Amendment.  <u>Estelle</u>, 429 U.S. at 105-06; <u>accord</u> <u>Gregg v. Georgia</u>, 428 U.S. 153, 182-83 (1976); <u>Tamez</u>, 589 F.3d at 770; <u>Hare</u>, 74 F.3d at 650.  "Deliberate indifference" means that a prison official is liable "only if he knows that the inmates face a substantial risk of serious harm and [he] disregards that risk by failing to take reasonable measures to abate it."  <u>Farmer v. Brennan</u>, 511 U.S. 825, 847 (1994).

Two requirements must be met before Section 1983 liability will arise for constitutional violations relating to conditions of confinement of the type plaintiff described.  First, the alleged deprivation must objectively be "sufficiently serious," which means that "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm."  <u>Farmer v. Brennan</u>, 511 U.S. 825, 847 (1994).  To rise to the level of a constitutional violation, the conditions must be "so serious as to deprive [plaintiff] of the minimal measure of life's necessities."  <u>Alexander v. Tippah County</u>, 351 F.3d 626, 630 (5th Cir. 2003) (quotation omitted).

Second, the inmate must show that a prison official was deliberately indifferent to inmate health or safety.  <u>Farmer</u>, 511 U.S. at 847.  A prison official cannot be held liable "unless the official <u>knows of and disregards an excessive risk to inmate health or safety;</u> the official <u>must both be aware of facts</u> from which the inference could be drawn

that a substantial risk of serious harm exists, and <u>he must also draw the inference</u>."  <u>Id.</u>

at 837 (emphasis added); <u>accord</u> <u>Tamez</u>, 589 F.3d at 770.

> The Supreme Court has recently reaffirmed that deliberate indifference is a <u>stringent</u> standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. . . .  The "deliberate indifference" standard permits courts to separate omissions that amount to an intentional choice from those that are merely unintentionally negligent oversight[s].

<u>Southard v. Tex. Bd. of Crim. Justice</u>, 114 F.3d 539, 551 (5th Cir. 1997) (citations and

quotations omitted) (emphasis added); <u>accord</u> <u>Tamez</u>, 589 F.3d at 770.  "'Subjective

recklessness,'" as used in the criminal law, is the appropriate test for deliberate

indifference."  <u>Norton</u>, 122 F.3d at 291 (citing <u>Farmer</u>, 511 U.S. at 838-40).

A. <u>Outdoor Exercise</u>

Tyson alleges that being required to remain shackled during outdoor exercise

creates a risk of injury that prevents him from exercising at all.  Defendants' competent

summary judgment evidence establishes that all inmates in Extended Lockdown are

housed in the same unit and that inmates in Extended Lockdown Level 1 are subject to

more stringent regulations regarding the use of mechanical restraints than other prisoners.

Thus, Tyson is incarcerated in the vicinity of other recalcitrant offenders, like himself,

with disciplinary problems.  Pursuant to Rayburn Institutional Directive 3.1.13, prisoners

in Extended Lockdown Level 1 are restrained with handcuffs, leather restraint belt and

shackles before leaving their cells for callouts and outdoor exercise time.  Prison officials have decided that such restraints are necessary to protect the safety of Level 1 inmates, other inmates and prison staff.

The Fifth Circuit "has held that deprivation of exercise may constitute an impairment of health, which is actionable under the Eighth Amendment, and that the absence of outdoor exercise opportunities may constitute an Eighth Amendment violation."  Hewitt v. Henderson, 271 F. App'x 426, 428 (5th Cir. 2008) (citations omitted).  "While neither the Fifth Circuit nor the United States Supreme Court has ever specifically held that inmates enjoy an absolute right to out-of-cell exercise, the Fifth Circuit has repeatedly held that an extended deprivation of exercise opportunities might impinge upon an inmate's Eighth Amendment rights depending upon the particular facts of a given case."  Doolittle v. Holmes, No. 06-986-C, 2010 WL 22552, at *4 (M.D. La. Jan. 4, 2010) (Brady, J.) (citing Hewitt, 271 F. App'x at 428; Green v. Ferrell, 801 F.2d 765 (5th Cir. 1986); McGruder v. Phelps, 609 F.2d 1023 (5th Cir. 1979)) (emphasis in original).

However, it is clear that inmates have no protected liberty interest in specific recreational opportunities.  Lato v. Attorney Gen., 773 F. Supp. 973, 978 (W.D. Tex. 1991) (citing Beck v. Lynaugh, 842 F.2d 757, 762 (5th Cir. 1988)).  To succeed on a claim under Section 1983 for lack of exercise, a prisoner must establish "the existence

of any health hazard under the specific circumstances involved." Ruiz v. Estelle, 679 F.2d 1115, 1152 (5th Cir.), amended in part, vacated in part on other grounds, 688 F.2d 266 (5th Cir. 1982); accord Delaney v. DeTella, 256 F.3d 679, 684 (7th Cir. 2001); Green v. Ferrell, 801 F.2d 765, 771 (5th Cir. 1986).

Plaintiff must also allege an actual injury caused by defendants' acts. See Lawson v. Stevens, 62 F.3d 394, 1995 WL 450100, at *1 (5th Cir. 1995) (citing Knight v. Caldwell, 970 F.2d 1430, 1432 (5th Cir. 1992)) (prisoner who "concedes that he was not harmed by the leg irons" with which he was shackled failed to state Eighth Amendment violation); Jackson v. Culbertson, 984 F.2d 699, 700 (5th Cir. 1993) (excessive force claim dismissed as frivolous when prisoner suffered no injury); Oliver v. Collins, 904 F.2d 278, 281 (5th Cir. 1990) (dismissal was proper when plaintiff alleged insufficient causal connection between defendants' conduct and the claimed assault, and plaintiff did not allege constitutional harm); Auster Oil & Gas, Inc. v. Stream, 835 F.2d 597, 602 (5th Cir. 1988) (Section 1983 is designed to compensate persons for actual injuries caused by deprivation of constitutional rights); Jefferson v. City of Hazelhurst, 936 F. Supp. 382, 386 (S.D. Miss. 1995) ("To state a cause of action under Title 42 U.S.C. § 1983, the plaintiff must plead . . . that there exists a direct causal connection, . . . without intervening factors, between the deprivation and some injury to plaintiff.").

The Fifth Circuit has long recognized that the use of handcuffs and shackles is a rational and common security measure in prisons.

> In Fulford v. King, 692 F.2d 11, 14-15 (5th Cir. 1982) we found the use of handcuffs or other restraining devices constituted a rational security measure and cannot be considered cruel and unusual punishment unless great discomfort is occasioned deliberately as punishment or mindlessly, with indifference to the prisoner's humanity.  In Fulford, the evidence at trial demonstrated that less restrictive alternatives of ensuring security during trips outside the prison were available to the state.  We concluded, however, that the Eighth Amendment does not require "that the state use the best means available for confining its prisoners."  It merely requires that the punishment not be "cruel and unusual."  The use of shackles and handcuffs are restraints commonly used on inmates, even those of a preferred status.

Jackson v. Cain, 864 F.2d 1235, 1243-44 (5th Cir. 1989) (quoting Fulford, 692 F.2d at 14 n.7).

Plaintiff has failed to establish any constitutional violation related to his exercise opportunities.  First, although he was restrained for security reasons, he was admittedly given time for outdoor exercise while in Extended Lockdown Level 1.  His choice not to exercise because he thought it was difficult with the restraints in place cannot establish a constitutional violation by defendants.  See Gates v. Cook, 376 F.3d 323, 344 (5th Cir. 2004) (Evidence showed that prisoners' shoes were replaced with flip-flops during exercise time because inmates otherwise used the shoes to kick other inmates and to throw at prison staff, and because flip-flops made escape more difficult.  Although

38

plaintiff argued that "the flip-flops make it difficult or impossible to exercise vigorously[,] . . . there is no support for the proposition that exercising in flip-flops constitutes cruel and unusual punishment."); Montgomery v. Puckett, 8 F.3d 20, 1993 WL 455545, at *2 (5th Cir. 1993) (prisoner's claims did not rise to the level of constitutional violations when he declined to take advantage of exercise time or access to the law library because he objected to being shackled upon leaving his cell to go to the yard or library).

Second, Tyson has not presented any evidence that the lack of exercise caused any serious health hazard.  He merely speculates that he might have suffered an unspecified injury if he had exercised while in restraints.  This speculation is insufficient to carry his summary judgment burden to establish either a substantial risk or serious harm or any actual injury.  See Haralson, 356 F. App'x at 697 (inmate who was denied out-of-cell exercise for seven months while in the prison infirmary failed to raise a genuine issue of material fact as to whether he suffered a serious injury sufficient to constitute an Eighth Amendment violation); Hernandez v. Velasquez, 522 F.3d 556, 561 (5th Cir. 2008) (Assuming the evidence created a fact issue whether plaintiff suffered from muscle atrophy, stiffness, loss of range of motion, and depression as a result of lack of out-of-cell exercise for 13 months, "there is nonetheless no indication these conditions posed a substantial risk of serious harm.  The district court properly concluded there was no

39

genuine issue as to whether Hernandez suffered a 'serious illness or injury' sufficient to constitute an Eighth Amendment violation."); Doolittle, 2010 WL 22552, at *6 ("[A]lthough the plaintiff alleged in his Complaint that he suffered muscle atrophy as a result of his confinement for 2 1/2 months without exercise, there is no evidence to support this conclusory assertion.  The plaintiff has provided nothing to support his claim of muscle atrophy or to show its extent or duration," and his medical records revealed no complaints about muscle atrophy during the relevant time period.).

Plaintiff has neither established that he was actually deprived of outdoor recreation nor that he suffered any physical injury or violation of his constitutional rights of any kind as a result of the security restrictions imposed on him during outdoor exercise. Accordingly, defendants are entitled to summary judgment as a matter of law on this claim.

B.    Housing with Mentally Ill Inmates

Assuming (without concluding) solely for purposes of defendants' pending motion for summary judgment that Tyson was housed with mentally ill inmates who were sometimes noisy and who were sometimes sprayed with chemical agents in plaintiff's vicinity, these incidents do not violate the Eighth Amendment.

As previously stated, to succeed on these claims, Tyson must establish that he is incarcerated under conditions posing a substantial risk of serious harm and that a prison

40

official was deliberately indifferent to his health or safety.  As to his complaint about noise, plaintiff alleges in his written submissions only that the mentally ill inmates were loud.  He does not explain how the noise posed a substantial risk of serious harm to his health or safety, nor does he allege that any official knew of and disregarded that risk. Although Tyson has not specifically alleged sleep deprivation as a result of the noise, that could be a harm because "sleep constitutes a basic human need, and conditions designed to prevent sleep may violate the Eighth Amendment.  However, [plaintiff's] allegations do not show the existence of noise intentionally designed to deprive him of sleep or sufficient to state a viable Eighth Amendment claim."  Johnson v. Tex. Bd. of Crim. Justice, 281 F. App'x 319, 322 (5th Cir. 2008) (citing Harper v. Showers, 174 F.3d 716, 720 (5th Cir. 1999); Lacy v. Collins, 66 F.3d 321, 1995 WL 535114, at *4 (5th Cir. Aug. 8, 1995)).  Occasional loud noise, in the absence of a showing of deprivation of a basic necessity of life, such as sleep, does not violate the Constitution.

As to Tyson's assertion that he was forced to smell and/or inhale the residual or secondhand fumes of chemical spray that had been aimed at other inmates, he again fails to establish either a substantial risk of serious harm or that any prison official was deliberately indifferent to his health or safety.  Defendants' competent summary judgment evidence establishes that the chemical agent used at Rayburn is capsicum, or cayenne pepper.  Although the smell of pepper spray can cause sneezing or a runny nose,

41

the smell lingers in the air for only 10 to 15 minutes and is comparable to the odor in a kitchen when cooking with cayenne pepper.  The guards at Rayburn who use pepper spray do not themselves wear masks or any other protective gear, and generally do not even shower until after they leave the jail.  Absent direct contact with the spray, any side effects other than temporary sneezing or a runny nose are unlikely.

Prison officials may reasonably use pepper spray or similar chemical agents to maintain or restore order.  E.g., Scott v. Hanson, 330 F. App'x 490, 491 (5th Cir.), cert. denied, 130 S. Ct. 638 (2009); Thomas v. Comstock, 222 F. App'x 439, 442 (5th Cir. 2007) (citing Williams v. Benjamin, 77 F.3d 756, 763 (4th Cir. 1996); Soto v. Dickey, 744 F.2d 1260, 1270-71 (7th Cir. 1984)); Baldwin v. Stalder, 137 F.3d 836, 840-41 (5th Cir. 1998).  Furthermore, prison officials are not required to jeopardize their own safety by attempting to segregate a few misbehaving inmates from other inmates before applying a brief burst of chemical spray into a group of inmates in a good faith use of force to restore order in a dangerous situation.  See id. at 838, 840-41.

In the instant case, Tyson has provided no evidence that the use of pepper spray against other inmates in his vicinity posed a substantial risk of harm to him, that he was actually injured by smelling or breathing the fumes or that defendants were aware of a substantial risk of harm to the inmates and ignored it.  It is undisputed that Tyson is housed in the maximum custody area of Rayburn and that other inmates in Extended

42

Lockdown Level 1 are housed there based on continued misconduct, very serious violations of the disciplinary rules or assaults on staff and/or other inmates. Plaintiff has provided no evidence that occasional uses of pepper spray to restore order and discipline, to which he was only secondarily exposed, violated any constitutional right.

Accordingly, defendants are entitled to summary judgment in their favor on this claim.

## IV. PLAINTIFF'S PENDING MOTIONS

For the same reasons that defendant's motion for summary judgment should be granted, plaintiff's pending motions should be DENIED. These are (1) Motion for Judgment on the Pleadings, Record Doc. No. 56; (2) Motion for Judgment on the Pleadings, Record Doc. No. 57; (3) Request for Declaratory and Prospective Injunctive Relief, Record Doc. No. 66; (4) Motion for Summary Judgment, Record Doc. No. 69; (5) Notice of Objections, Record Doc. No. 81; (6) Document in Support of Summary Judgment, Record Doc. No. 82; (7) Amended Motion for Summary Judgment, Record Doc. No. 83; (8) Notice of Voluntary Compliance in Part, Record Doc. No. 84, and (9) Request Preservation of All Objection, Record Doc. No. 85.

## RECOMMENDATION

For all of the foregoing reasons, it is **RECOMMENDED** that defendants' motion for summary judgment be **GRANTED,** that plaintiff's motions listed in the preceding paragraph be **DENIED,** and that plaintiff's complaint be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[5]

New Orleans, Louisiana, this   19th   day of November, 2010.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[5]Douglass referred to the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.

44